# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Antonia Aguilar Maldonado,<br><br>         Petitioner,<br><br>v.<br><br>Samuel J. Olson, Field Office Director of Enforcement and Removal Operations, St. Paul Field Office, Immigration and Customs Enforcement; Kristi Noem, in her official capacity as Secretary of U.S. Department of Homeland Security, in her official capacity; U.S. Dept. of Homeland Security; Eric Tollefson, Kandiyohi County Jail Sheriff,<br><br>         Respondents. | No. 25-cv-3142 (SRN/SGE)<br><br><br><br>**ORDER** |

Gloria Leticia Contreras Edin, Contreras Edin Law, PA, 663 University Ave. W., Ste. 200, Saint Paul, MN 55104, and Hannah Brown, 1907 E. Wayzata Blvd., Ste. 300, Wayzata, MN 55391, for Petitioner

Ana Voss, U.S. Attorney's Office, 300 S. 4th St., Minneapolis, MN 55415, for Respondents

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Petitioner Antonia Aguilar Maldonado's First Motion for a Temporary Restraining Order [Doc. No. 2]. Because counsel for Respondents entered an appearance and responded to Petitioner's motion, the Court construes the motion as a Motion for a Preliminary Injunction.

On August 12, 2025, counsel for both parties appeared at an expedited hearing on Ms. Aguilar Maldonado's Motion.  At the time of the hearing, Ms. Aguilar Maldonado was in the custody of Immigration and Customs Enforcement ("ICE").  She seeks an order restraining and enjoining Respondents from continuing to detain her during the pendency of her Petition for a Writ of Habeas Corpus [Doc. No. 1].  After entertaining argument from counsel, the Court ruled from the bench, granting Ms. Aguilar Maldonado's Motion for a Preliminary Injunction.  (Aug. 12, 2025 Text-Only Am. Minute Entry [Doc. No. 16].)  This written order memorializes the Court's ruling.

## I.    BACKGROUND

### A. Immigration Proceedings

Ms. Aguilar Maldonado is a citizen of El Salvador who entered the United States as an unaccompanied alien child ("UAC")[1] on September 9, 2016, when she was 16 years old.  (Robinson Decl. [Doc. No. 12] ¶ 4.)  She entered without "inspection," and at that time, when U.S. Border Control representatives encountered her, they issued her a Notice to Appear ("NTA").  (*Id.* ¶ 4 & Ex. A (NTA) [Doc. No. 12-1].)  As a UAC, she was initially

---

[1] Under U.S. immigration law, an "unaccompanied alien child" is a child who

    (A) has no lawful immigration status in the United States;
    (B) has not attained 18 years of age; and
    (C) with respect to whom—
        (i) there is no parent or legal guardian in the United States; or
        (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

6 U.S.C. § 279(g)(2).

placed in the custody of the Office of Refugee and Resettlement for housing and care, and was released several months later to a sponsoring relative. (Robinson Decl. ¶¶ 4–5.)

Several years later, on March 27, 2019, an immigration judge ("IJ") at Fort Snelling, Minnesota ordered the removal of Aguilar Maldonado from the United States to El Salvador in absentia after she failed to appear for a scheduled immigration court hearing. (*Id.* ¶ 6 & Ex. B (2019 IJ Order) [Doc. No. 12-2].) Ms. Aguilar Maldonado denies receiving notice of the hearing, and, on May 30, 2024, she moved to reopen her removal proceedings in immigration court. (Robinson Decl. ¶ 7.) The IJ granted her motion, finding that Ms. Aguilar Maldonado had not received notice of the 2019 hearing. (*Id.* ¶ 8 & Ex. C (2024 IJ Order) [Doc. No. 12-3].) She is presently in the midst of a pending asylum application in immigration court before IJ Kalin Ivany. (*See* Aug. 7, 2025 Order [Doc. No. 10] at 2.) However, her counsel represents that Ms. Aguilar Maldonado has moved to terminate those proceedings before the Executive Office of Immigration Review ("EOIR") based on her belief that USCIS may have original jurisdiction over her asylum claim because she entered the United States as a UAC. (Contreras Edin Decl. [Doc. No. 14] ¶ 7.) These proceedings remain pending.

Until recently, Ms. Aguilar Maldonado, who is now 25 years old, lived in Lake Elmo, Minnesota, with her husband and two minor children, ages 6 and 22 months. (Pet'r's Ex. A (Aguilar Maldonado Aff.) [Doc. No. 1-1] ¶¶ 1, 3.) The children are United States citizens. (*Id.* ¶ 3.)

On July 17, 2025, ICE agents arrested her and her husband as they left home for their work as house painters. (*Id.* ¶¶ 2, 16 & Pet'r's Ex. I (I-213 Record of

Deportable/Inadmissible Alien [Doc. No. 1-9]); Robinson Decl. ¶ 9.)  As her immigration record reflects, Ms. Aguilar Maldonado was not subject to an order of removal. Nevertheless, upon her arrest, she contends that ICE agents incorrectly informed her of an active removal order against her, and stated that her attorney had "lied" to her by informing her that a prior removal order had been rescinded upon the reopening of her case.  (Habeas Pet. ¶ 39.)

On the date of her arrest, ICE represented that Ms. Aguilar Maldonado was subject to removal under the Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i), "in that [she] [is] an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General."  (I-213 Record of Deportable/Inadmissible Alien at 2.)  On July 31, 2025, ICE added a charge of inadmissibility/deportability, stating,

> There is/are hereby lodged against you the additional charge(s) that you are subject to being taken into custody and deported or removed from the United States pursuant to the following provision(s) of law:
>
> 212(a)(7)(A)(i)(I) of the [INA], as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality as required under the regulations issued by the Attorney General under section 211(a) of the Act.

(Pet'r's Ex. J (I-261 Add'l Charges of Inadmissibility/Deportability) [Doc. No. 1-10].) Department of Homeland Security records reflect that Ms. Aguilar Maldonado has no

criminal history.  (I-213 Record of Deportable/Inadmissible Alien at 2.)  Respondents do not allege otherwise.

At the time of her arrest, Ms. Aguilar Maldonado was placed in detention.  On July 31, 2025—the same day that ICE added additional charges—Ms. Aguilar Maldonado appeared before IJ Ivany, seeking a redetermination of detention.  (Pet'r's Ex. F (Order Granting Bond) [Doc. No. 1-6].)  IJ Ivany, understanding that Petitioner's detention was governed by INA § 236(a), 8 U.S.C. § 1226(a), granted her request and ordered Ms. Aguilar Maldonado "released from custody under bond of $10,000." (*Id.* at 3.)  In the Order Granting Bond, IJ Ivany explained, "The Court finds that it has jurisdiction as [Aguilar Maldonado] entered as an unaccompanied child and is not properly deemed an applicant for admission." (*Id.*)

That same day, July 31, 2025, ICE noticed its intent to appeal the custody redetermination.  (Pet'r's Ex. G (EOIR-43 Notice of Intent to Appeal Custody Redetermination) [Doc. No. 1-7] at 1.)  Pursuant to 8 C.F.R. § 1003.19(i)(2), the filing of a notice of intent to appeal the custody redetermination has the effect of automatically staying the IJ's order to release a noncitizen on bond.  (Robinson Decl. ¶ 12; 8 C.F.R. § 1003.19(i)(2).)  Consequently, ICE's invocation of the automatic stay provision resulted in Ms. Aguilar Maldonado's continued detention, separating her indefinitely from her small children, from whom she has never been separated for any appreciable length of time. (Aguilar Maldonado Aff. ¶ 11.)

A senior legal official, ICE's Chief Counsel in the Minneapolis Office of the Principal Legal Advisor, Jim Stolley, signed the Notice of Intent to Appeal and certified his approval of the notice, stating,

> I further certify that I am satisfied that the evidentiary record supports the contentions justifying the continued detention of the alien and the legal arguments are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing precedent or the establishment of new precedent.  Further, the legal arguments, as specifically warranted above, may be premised on the alien being subject to mandatory detention pursuant to 235 of the [INA], 8 U.S.C. § 1225.

(EOIR-43 Notice of Intent to Appeal Custody Redetermination at 2.)  While Mr. Stolley certified that a factual, evidentiary record supported Ms. Aguilar Maldonado's detention, at the hearing on the instant motion, counsel for Respondents conceded that there was no such factual basis, but rather legal argument supported detention.

ICE then filed its Notice of Appeal with the Board of Immigration Appeals ("BIA") on August 5, 2025, asserting that Ms. Aguilar Maldonado, "who is present in the United States without admission or parole, is an applicant for admission in INA § 240 [8 U.S.C. § 1229a] removal proceedings."  (Robinson Decl., Ex. D (BIA Notice of Appeal) [Doc. No. 12-4] at 4.)  DHS/ICE contends that Ms. Aguilar Maldonado falls under INA § 235(b)(2), 8 U.S.C. § 1225(b)(2), a "catchall provision that applies to all applicants for admission not covered by [INA § 235(b)(1)]."  (*Id.* (citation omitted).)  Under this provision, DHS/ICE argues, Ms. Aguilar Maldonado may only be released pursuant to DHS's discretionary parole authority, and not pursuant the release ordered by IJ Ivany under INA § 236(a), 8 U.S.C. § 1226(a).  (*Id.*)

6

Ms. Aguilar Maldonado is currently detained at the Kandiyohi County Jail (the "Jail"), in Willmar, Minnesota. (Aguilar Maldonado Aff. ¶ 2.)

### B. Proceedings in this Court

On August 6, 2025, Ms. Aguilar Maldonado filed a Petition for a Writ of Habeas Corpus [Doc. No. 1] along with her Motion for a Preliminary Injunction, alleging that she is being detained in violation of the Fifth Amendment to the U.S. Constitution, the INA, 8 U.S.C. §§ 1101 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. In her Motion for a Preliminary Injunction, Ms. Aguilar Maldonado argues that she was unlawfully taken into ICE custody, and remained in detention despite being granted bond. (Pet'r's Mem. [Doc. No. 3] at 3.)

In a sworn affidavit, she avers that she is suffering irreparable harm as a result of her detention. (Aguilar Maldonado Aff. ¶¶ 4–18.) As noted, she states that she has never been separated from her young children for any significant period of time. (*Id.* ¶ 11.) With respect to her youngest child, she has continued to breastfeed him due to reflux issues the child experienced from digesting other types of milk.[2] (*Id.* ¶¶ 4, 10.) Prior to her detention, she fed her nursing child approximately 25 ounces of breast milk per day. (*Id.* ¶ 4.) As a nursing mother, Ms. Aguilar Maldonado must pump her breast milk every day. (*Id.* ¶ 6.) At the Jail, Ms. Aguilar Maldonado feels "nothing but sadness" when using a manual breast pump that the Jail provided her. (*Id.* ¶ 7.) She states, "It breaks my heart to know that my baby needs my breast milk, and that I just have to dump it out. I am extracting

---

[2] Ms. Aguilar Maldonado states that her older child experienced similar problems, causing her to also breastfeed him for a longer time. (Id. ¶ 10.)

approximately 3–4 ounces per breast during each session." (*Id.* ¶ 7.) In addition to producing less breast milk, she contends that her breast milk is now tinted green, which she attributes to her acute distress. (*Id.* ¶¶ 7, 13.)

Ms. Aguilar Maldonado also "hold[s] back tears just thinking about" her 6-year-old child, who asked his grandmother why his mother "abandoned him." (*Id.* ¶ 12.) Her efforts to call her children from the Jail have not been successful, as the calls have not gone through. (*Id.* ¶ 11.) She is also concerned about her 6-year-old's progress in school if she remains in detention, as well as the lack of household income while she and her husband are detained, and the potential loss of their home. (*Id.* ¶¶ 15–17.)

In her Motion for a Preliminary Injunction, Ms. Aguilar Maldonado seeks an order enjoining Respondents from continuing to detain her during the pendency of her habeas petition, and, alternatively, if she is not immediately released, she seeks an order enjoining Respondents from transferring her to a detention facility out of this District. (Pet'r's Mem. at 26–27.) The day after Petitioner filed her Motion for a Preliminary Injunction, Magistrate Judge Shannon Elkins held a status conference at which Hannah Brown, counsel for Petitioner, and Ana Voss, counsel for Respondents, appeared. (Aug. 6, 2025 Minute Entry [Doc. No. 9].) At the status conference, Ms. Voss represented to Magistrate Judge Elkins that Petitioner will not be removed until after her appeal on the asylum application is complete, in the event the immigration court denies it. In light of counsel's representation on Petitioner's alternate ground for relief, the Court focuses on Ms. Aguilar Maldonado's request for immediate release during the pendency of her Habeas Petition.

## II.    DISCUSSION

### A. Jurisdiction

As a threshold matter, Respondents argue that this Court lacks jurisdiction to review Petitioner's claims and to consider the Motion for a Preliminary Injunction.[3] (Resp't Opp'n [Doc. No. 11] at 1–2.)

First, they argue that Ms. Aguilar Maldonado's claims for relief stem from ICE's decision to commence removal proceedings, and that a separate statute, 8 U.S.C. § 1252(g), divests this Court of jurisdiction under these circumstances. Second, Respondents contend that under 8 U.S.C. § 1252(b)(9), Ms. Aguilar Maldonado's Fifth Amendment claim must be considered by the appropriate circuit court of appeals, not this Court.

A district court may grant a writ of habeas corpus to any person who demonstrates he is in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2241(c)(3). Historically, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). Habeas corpus review has served a longstanding role in immigration cases, as the Supreme Court has observed:

> Before and after the enactment in 1875 of the first statute regulating immigration, 18 Stat. 477, [federal habeas corpus] jurisdiction was regularly invoked on behalf of noncitizens, particularly in the immigration context. . . . In case after case, courts answered questions of law in habeas corpus proceedings brought by aliens challenging Executive interpretations of the immigration laws.

---

[3] This jurisdictional challenge also implicates one of the factors courts must consider when assessing the right to injunctive relief—the likelihood of success on the merits, which the Court addresses in greater detail, *infra* at II.A.1.

*Id.* at 305–07.   A person challenging the lawfulness of immigration-related detention may also avail themselves of a writ of habeas corpus.  *Deng Chol A. v. Barr*, 455 F. Supp. 3d 896, 900–01 (D. Minn. 2020) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 485 (1973); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); and *Demore v. Kim*, 538 U.S. 510, 517 (2003)).   While the court "may not review discretionary decisions made by immigration authorities, it may review immigration-related detentions to determine if they comport with the demands of the Constitution."  *Id.* (citing *Zadvydas*, 533 U.S. at 688).  As relevant here, the Fifth Amendment entitles noncitizens "to due process of law in deportation proceedings."  *Demore*, 538 U.S. at 523 (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)).  The habeas petitioner bears the burden of demonstrating by a preponderance of the evidence that their detention is unlawful.  *Freeman v. Pullen*, 658 F. Supp. 3d 53, 58 (D. Conn. 2023); *Lavalle v. Martinez*, 609 F. Supp. 3d 164, 171 (E.D.N.Y. 2022); *see also Bradin v. United States Probation & Pretrial Servs.*, No. 22-cv-3032-JWL, 2022 WL 1154622, at *3 (D. Kan. Apr. 19, 2022) (collecting cases discussing burden of proof in § 2241 habeas cases).

Under certain circumstances, however, Congress may modify or limit the right to habeas review.  *Aditya W. H. v. Trump*, --- F. Supp. 3d ----, No. 25-cv-1976 (KMM/JFD), 2025 WL 1420131, at *8 (D. Minn. May 14, 2025) (citing *Ozturk v. Trump*, No. 2:25-cv-374, 2025 WL 1145250, at *12 (D. Vt. Apr. 18, 2025) ("Congress may modify or eliminate the right to seek the writ if Congress provides 'a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention.'" (quoting *Swain v.*

*Pressley*, 430 U.S. 372, 381 (1977))).  As Judge Katherine Menendez noted in *Aditya*, it is true that "Congress included certain 'jurisdiction-stripping' provisions in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ('IIRIRA'), and the REAL ID Act of 2005.  And the REAL ID act notes that the jurisdiction-stripping provisions of the IIRIRA apply to habeas petitions." *Id.* (citing Pub. L. 204-208, 110 Stat. 3009; Pub. L. 10-13, 119 Stat. 302).  However, these jurisdiction-stripping provisions "do not eliminate habeas jurisdiction over all immigration-related detention claims," and, as in *Aditya*, they do not apply to the claims that Ms. Aguilar Maldonado asserts here.  *Id.* (citing *Ozturk v. Hyde*, 136 F.4th 382, 387–88 (2d Cir. 2025) (denying the government's motion to stay the district court's order that petitioner be transferred from Louisiana to Vermont and finding that the government failed to show it was likely "to prevail on its arguments that various jurisdiction-stripping provisions of the [INA] . . . deprive the district court of jurisdiction over Ozturk's challenge to her detention").  As the Court discusses below, the statutes on which Respondents rely do not divest this Court of jurisdiction.

### 1.  Section 1252(g)

Section 1252(g) addresses jurisdiction over certain claims raised by noncitizens, stating,

> [e]xcept as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). Respondents contend that § 1252(g) "also bars district courts from hearing challenges to the *method* by which the Secretary of Homeland Security chooses to commence removal proceedings, including the decision to detain an alien pending removal." (Resp't Opp'n at 11 (citing *Alvarez v. ICE*, 818 F.3d 1194, 1203 (11th Cir. 2016) ("By its plain terms, [§ 1252(g)] bars us from questioning ICE's discretionary decisions to commence removal" and also to review "ICE's decision to take [plaintiff] into custody and to detain him during removal proceedings.")).) But the Supreme Court has cautioned that the jurisdictional limits under § 1252(g) are "narrow," and apply only to the "review of cases 'arising from' decisions 'to commence proceedings, adjudicate cases, or execute removal orders.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 19 (2020).

The Supreme Court first addressed the narrow reach of § 1252(g) in *Reno v. American-Arab Anti-Discrimination Comm.*, a case challenging the refusal of INS to grant "deferred action" by declining to remove a noncitizen on humanitarian grounds. 525 U.S. 471, 482–85 (1999). The Supreme Court held that § 1252(g) prohibited attacks on such refusals because Congress had "directed" the statute "against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Id.* at 485 n.9. The Supreme Court observed that there was "good reason" for Congress to proscribe judicial review of the Attorney General's "discrete acts of 'commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders,'" as they constituted "the initiation or prosecution of various stages in the deportation process." *Id.* at 483 (quoting § 1252(g)).

12

In comparison with these three discrete categories, however, the Supreme Court noted that there are "many other decisions or actions that may be part of the deportation process," such as "the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order." *Id*. at 482. The Supreme Court rejected the notion that § 1252(g) "covers the universe of deportation claims," finding it "implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." *Id.*

The Supreme Court has since reaffirmed its narrow construction of § 1252(g), observing in *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018), that *Reno* "did not interpret [the phrase 'arising from' in § 1252(g)] to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General. Instead, [*Reno*] read the language to refer to just those three specific actions themselves." *Id*. at 841. Moreover, the majority in *Jennings* discounted the argument, proposed in Justice Thomas's concurrence, that the Respondents propound here: "The concurrence contends that 'detention is an "action taken . . . to remove" an alien' and that therefore 'even the narrowest reading of "arising from" must cover' the claims raised by respondents. We do not follow this logic." *Id*. at 841 n.3 (quoting Thomas, J., concurring in part and concurring in judgment). The First Circuit's opinion in *Kong v. United States* is consistent with this authority, as the court stated, "Section 1252(g)'s bar on judicial review of claims arising from the government's decision to execute removal orders does not preclude jurisdiction

13

over the challenges to the legality of the detention at issue here."  62 F.4th 608 (1st Cir. 2023).

Petitioner's claims do not challenge the actions of Respondents in commencing proceedings, adjudicating cases, or executing removal orders.  Instead, Ms. Aguilar Maldonado contends that her continued detention pursuant to an automatic stay regulation violates the Fifth Amendment.  Her claim is not tied to a decision to "commence" removal proceedings because such proceedings were commenced long ago.  Furthermore, custody proceedings are independent of "commencing" removal proceedings under § 1226, for which a separate jurisdictional provision applies, 1226(e).  Respondents' position that detention is mandatory for all who enter without inspection would effectively remove discretion, and would render § 1226(e) inapplicable, and § 1252(g) irrelevant.  Congress would not have enacted § 1226(e) if § 1252(g) already broadly barred review of custody determinations.

Moreover, as Petitioner observes, while Respondents argue that jurisdiction over Petitioner's claims should lie with the BIA or a federal circuit court of appeals through a petition for review, "[t]his ignores the plain fact that the regulations provide no legal mechanism to challenge or appeal the automatic stay before the EOIR, the BIA, or the circuit court."  (Reply [Doc. No. 13] at 6–7; *see* 8 C.F.R. § 1003.19(i)(2).)  Indeed, Respondents identify no alternative forum or tribunal in which Ms. Aguilar Maldonado may challenge ICE's continued detention of her, in contravention of an IJ's order releasing her on bond.

Again, Ms. Aguilar Maldonado's Fifth Amendment claim is "independent of, and collateral to, the removal process," and "does not arise from the government's commence[ment of] proceedings." *Ozturk*, 136 F.4th at 397–98 (finding petitioner's habeas claim of unlawful and retaliatory detention was not jurisdictionally barred under § 1252(g)). In *Günaydin v. Trump*, --- F. Supp. 3d ----, No. 25-cv-1151 (JMB/DLM), 2025 WL 1459154, at *4–5 (D. Minn. May 21, 2025), the petitioner challenged his ongoing detention following the government's invocation of the automatic stay regulation, as Ms. Aguilar Maldonado does here. While the court's discussion did not expressly address jurisdiction, by reaching the merits of Günaydin's claim that the automatic stay provision constituted an unlawful process, *see id.* at *7–9, it implicitly concluded that it possessed jurisdiction.

Accordingly, based on the plain language of § 1252(g), Supreme Court authority narrowly construing it, and the authority noted above, the Court finds that it has jurisdiction over Ms. Aguilar Maldonado's habeas petition.

### 2. Section 1252(b)(9)

Respondents also rely on 8 U.S.C. § 1252(b)(9) in support of their jurisdictional challenge, arguing that jurisdiction lies with the court of appeals in the petition-for-review process, and not with this Court. (Resp't Opp'n at 13.) Section 1252(b)(9) provides:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus

under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9).

Section 1252(b)(9) is aimed at challenges to removal proceedings, and "is a judicial channeling provision, not a claim-barring one." *Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 11 (1st Cir. 2007). Given the constitutional challenge to Petitioner's detention, as opposed to a challenge to removal, jurisdiction over her habeas petition is proper. It is undisputed that her claims do not challenge a removal order, and § 1252(b)(9) cannot insulate unconstitutional detention from judicial review. In fact, the EOIR does not possess jurisdiction to consider a constitutional challenge, as the Second Circuit observed in *Ozturk*:

> While challenges to **removal** can be heard in a petition for review after an order of removal has been entered by an immigration judge and affirmed by the Board of Immigration Appeals, the same is not true of constitutional challenges to **detention** like the ones raised by Ozturk. For one, neither the IJ nor the BIA has "jurisdiction to decide constitutional issues." *Rabiu v. Immigr. & Naturalization Serv.*, 41 F.3d 879, 882 (2d Cir. 1994); *see also Hinds v. Lynch*, 790 F.3d 259, 262 (1st Cir. 2015) (citing *Matter of C-*, 20 I. & N. Dec. 529, 532 (BIA 1992)); *Arriaga v. Mukasey*, 521 F.3d 219, 222 (2d Cir. 2008) (same). And while the court of appeals considering the petition for review may consider constitutional claims, that court is obliged to "decide the petition only on the administrative record on which the order of removal is based." 8 U.S.C. § 1252(b)(4)(A) (emphasis added). However, we are not persuaded that an IJ or the BIA would have developed a sufficient factual record, or any record at all, with respect to the challenged detention, especially seeing as bond hearings are decided separately, appealed separately, and contain separate records than the removal proceedings.

16

136 F.4th at 400.

The Supreme Court's decision in *Jennings*, supports the conclusion that § 1252(b)(9) does not divest the court of jurisdiction to review a constitutional challenge to an automatic stay regulation. 583 U.S. at 294–95 ("For present purposes, it is enough to note that respondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar."); s*ee also Nadarajah v. Gonzales*, 443 F.3d 1069, 1075–76 (9th Cir. 2006) (finding that § 1259(b)(9)'s jurisdiction-stripping provisions only apply to final orders of removal, and that Article III courts retain jurisdiction over constitutional challenges to detention).

In recent decisions in this District, judges have rejected the same jurisdictional arguments that Respondents assert here. In *Mohammed H. v. Trump*, Judge Jerry Blackwell found that §§ 1252(b)(9) and 1252(g) did not preclude habeas jurisdiction because the petitioner was not seeking to end his removal proceeding or to vacate any underlying executive determinations. --- F. Supp. 3d ----, No. 25-cv-1576 (JWB/DTS), 2025 WL 1334847, at *3 (D. Minn. May 5, 2025). Rather, the petitioner was seeking to end his allegedly unlawful confinement, as Ms. Aguilar Maldonado seeks to do here. *Id*. In *Aditya*, Judge Menendez also concluded that § 1252(b)(9) did not divest the court of jurisdiction because the petitioner's requested relief was not review of a final order of removal. 2025 WL 1420131, at *9 (rejecting argument that § 1252(b)(9) presents a jurisdictional bar).

17

The legislative history of § 1259(b)(9) also confirms that federal courts retain jurisdiction over habeas challenges to detention:

> [C]ertain claims are excluded from the sweep of section 1252(b)(9) by virtue of legislative intent and judicial precedent. To illustrate, the legislative history indicates that Congress intended to create an exception for claims "independent" of removal. H.R. Rep. No. 109–72, at 175, *as reprinted in* 2005 U.S.C.C.A.N. at 300. Thus, when it passed the REAL ID Act, Congress stated unequivocally that the channeling provisions of section 1252(b)(9) should not be read to preclude "habeas review over challenges to detention." *Id.* (indicating that detention claims are "independent of challenges to removal orders"). In line with this prescription, we have held that district courts retain jurisdiction over challenges to the legality of detention in the immigration context. *See Hernández v. Gonzales*, 424 F.3d 42, 42 (1st Cir. 2005) (holding that detention claims are independent of removal proceedings and, thus, not barred by section 1252(b)(9)).

*Aguilar*, 510 F.3d at 10–11.

Again, Ms. Aguilar Maldonado does not seek this Court's review of a final order of removal, as she is not subject to one. For all of the reasons set forth above, the Court therefore finds that it possesses jurisdiction to entertain Ms. Aguilar Maldonado's Habeas Petition and her Motion for a Preliminary Injunction to the extent she challenges the constitutionality of her detention.

### A. *Dataphase* Factors

Turning to the merits of the instant motion, Federal Rule of Civil Procedure 65 authorizes the Court to grant injunctive relief in the form of a preliminary injunction. The

purpose of a preliminary injunction is to maintain the status quo.[4]  *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022).

To determine whether injunctive relief is proper, a district court considers four factors:  (1) the movant's likelihood of success on the merits, (2) the threat of irreparable harm to the movant, (3) the balance between the harm to the movant and the injury that granting an injunction will inflict on other parties to the litigation, and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  "While 'no single factor is determinative,' the probability of success factor is the most significant."  *Wilbur-Ellis Co., LLC v. Erikson*, 103 F.4th 1352, 1356 (8th Cir. 2024) (citing *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase*, 640 F.2d at 113)).  The court must balance all the factors in deciding whether the injunction should be granted.  *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023).  The burden rests with the movant to establish that injunctive relief should be granted.  *See Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

Based on the current record, the Court finds that all four factors weigh in favor of granting injunctive relief.

### 1.  Likelihood of Success on the Merits

Noncitizens are entitled to due process of the law under the Fifth Amendment.  *Demore*, 538 U.S. at 523; *Sanchez-Valasco v. Holder*, 593 F.3d 733, 737 (8th Cir. 2010).

---

[4] While Respondents contend that "[j]udicial intervention would only disrupt the status quo," (Resp't Opp'n at 31), the Court respectfully disagrees.  The status quo here is release on bond, as reflected in the last word on detention—the IJ's order releasing Petitioner on bond.

To determine whether civil detention violates a detainee's Fifth Amendment due process rights, courts apply the three-part test in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Under *Mathews*, courts weigh the following three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

### a. Private Interest

"The interest in being free from physical detention" is "the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529, 531 (2004). It appears undisputed that Ms. Aguilar Maldonado thus has a significant private interest in being free from physical detention. Moreover, when assessing the private interest, courts consider the detainee's conditions of confinement, namely, "whether a detainee is held in conditions indistinguishable from criminal incarceration." *Günaydin*, 2015 WL 1459154, at *7 (citing *Hernandez-Lara v. Lyons*, 10 F.4th 19, 27 (1st Cir. 2021) (noting noncitizen detainee held "alongside criminal inmates" at county jail); *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) (same)).

Ms. Aguilar Maldonado, who has no criminal history, has been detained at the Kandiyohi County Jail, at which pretrial criminal detainees and convicted criminals are also held. As in *Günaydin*, "[she] is experiencing all the deprivations of incarceration, including loss of contact with friends and family, loss of income earning, . . . lack of

20

privacy, and, most fundamentally, the lack of freedom of movement." *Id*. Moreover, she

has identified a significant private interest based on her separation from her children, one

of whom is a nursing child who depends upon his mother for nourishment.

The first *Mathews* factor therefore supports Ms. Aguilar Maldonado's claim of a

Fifth Amendment violation.

### b. Risk of Erroneous Deprivation

Under the second *Mathews* factor, courts must "assess whether the challenged

procedure creates a risk of erroneous deprivation of individuals' private rights and the

degree to which alternative procedures could ameliorate these risks." *Günaydin*, 2025 WL

1459154, at *8. Fundamental to this matter is Respondents' position that Ms. Aguilar

Maldonado is an applicant for admission and therefore falls within the mandatory detention

provisions of § 1225(b). Ms. Aguilar Maldonado, however, argues that Respondents have

detained her under 8 U.S.C. § 1226(a), as the IJ likewise found. A general understanding

of these two statutes informs the Court's analysis here, bearing in mind the critical

distinction that "noncitizens detained under Section 1225(b)(2) must remain in custody for

the duration of their removal proceedings, while those detained under Section 1226(a) are

entitled to a bond hearing before an IJ at any time before entry of a final removal order."

*Rodriguez v. Bostock*, --- F. Supp. 3d ----, 2025 WL 1193850, at *4 (W.D. Wash. Apr. 24,

2025).

### (1) Detention Under 8 U.S.C. § 1225

Section 1225(a) provides that a noncitizen "present in the United States who has not

been admitted or who arrives in the United States . . . shall be deemed for purposes of this

chapter an applicant for admission." Such applicants "fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." *Jennings*, 583 U.S. at 287.

Section 1225(b)(1) applies to arriving aliens and certain other aliens "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation." *Id.*; 8 U.S.C. § 1225(b)(1)(A)(i), (iii). Such aliens are generally subject to expedited removal proceedings "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." *Id.* § 1225(b)(1)(A)(i). Aliens claiming asylum or fear of persecution are "detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii). Aliens who make no such claims, or are "found not to have such a fear," are detained until removed. *Id.* §§ 1225(b)(1)(A)(i), (B)(iii)(IV).

Respondents contend that Ms. Aguilar Maldonado is detained under § 1225(b)(2), which has been described as "broader" than § 1225(b)(1), and which "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." *Jennings*, 583 U.S. at 287. Section 1225(b)(2) provides that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A). Respondents argue that, apart from those aliens who fall under § 1225(b)(1), essentially all arriving aliens and all aliens in the United States fall under § 1225(b)(2), which subjects them to mandatory detention. (Resp't Opp'n at 18.) In other words, under Respondents' view, detention is categorical in the case of nearly every alien entering this country,

whether they are newly arrived at the border or have been living in this country for several years.

### (2) Detention Under 8 U.S.C. § 1226

In contrast with § 1225(b), § 1226 sets forth a discretionary process for the apprehension and detention of aliens who are already present in the United States and eligible for removal, setting forth the "default rule" that "[t]he Attorney General may issue a warrant for the arrest and detention of an alien 'pending a decision on whether the alien is to be removed from the United States.'" *Jennings*, 583 U.S. at 288 (quoting § 1226(a)). Moreover, except as provided in § 1226(c), "the Attorney General 'may release' an alien detained under § 1226(a) 'on . . . bond' or 'conditional parole.'" *Id*. (quoting § 1226(a)). The exception under § 1226(c) is for a category of noncitizens subject to mandatory detention—noncitizens who have committed certain "enumerated . . . criminal offenses [or] terrorist activities." *Id*. at 289.  Persons who are subject to mandatory detention include certain categories of "inadmissible" noncitizens.  § 1226(c)(1)(A), (D), (E).

In January 2025, the Laken Riley Act added one such category subject to mandatory detention.   Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025); 8 U.S.C. § 1226(c)(1)(E).  The Laken Riley Act amendments mandate detention for noncitizens who are inadmissible under Sections 1182(a)(6)(A) (the inadmissibility ground for a noncitizen "present in the United States without being admitted or paroled"), 1182(a)(6)(C) (the inadmissibility ground for misrepresentation), or 1182(a)(7) (the inadmissibility ground for lacking valid documentation) and have been arrested for, charged with, or convicted of certain crimes.  *Id*.

### (3) Whether § 1225(b) or § 1226(a) Applies Here

"[T]he longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is." *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 386 (2024) (cleaned up).  Historically, noncitizens who resided in the United States, but who had previously entered without inspection, were not deemed "arriving aliens" under § 1225(b), but were instead subject to § 1226(a).  *See Jennings*, 583 U.S. at 287 ("In sum, U.S. immigration law authorizes the Government to detain certain aliens *seeking* admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens *already in the* country pending the outcome of removal proceedings under §§ 1226(a) and (c).") (emphasis added); *Rodriguez*, 2025 WL 1193850, at *15 (noting ICE's "longstanding agency practice [of] applying Section 1226(a) to inadmissible noncitizens already residing in the country.").  Noncitizens already residing in the county, such as Ms. Aguilar Maldanado, were placed in standard removal proceedings and received bond hearings, unless their criminal histories rendered them ineligible under § 1226(c).  *See Jennings*, 583 U.S. at 288.

The legislative history of the IIRIRA also reflects this historical treatment of noncitizens residing in the United States, who had previously entered without inspection. *See Rodriguez*, 2025 WL 1193850, at *15.  They were generally subject to deportation hearings and discretionary release on bond.  *Torres v. Barr*, 976 F.3d 918, 927 (9th Cir. 2020) (noting that prior to passage of the IIRIRA, a deportation hearing was the typical procedure for an alien already physically present, but not lawfully present, in the country, while an exclusion hearing was the typical procedure for an alien outside the United States,

seeking admission (citing *Hose v. I.N.S.*, 180 F.3d 992, 994 (9th Cir. 1999) (en banc))). Section 1226(a)'s predecessor statute, § 1252(a), included discretionary release on bond. *See* 8 U.S.C. § 1252(a) (1994). When passing the IIRIRA, Congress observed that the new § 1226(a) "restates" the Attorney General's authority to arrest, detain, and release on bond, as previously provided in § 1252(a). *Rodriguez*, 2025 WL 1193850, at *15 (citing H.R. Rep. No. 104-469, pt. 1, at 229; H.R. Rep. No. 104-828, at 210). "Because noncitizens like [Aguilar Maldonado] were entitled to discretionary detention under Section 1226(a)'s predecessor statute and Congress declared its scope unchanged by IIRIRA, this background supports [Aguilar Maldonado's] position that [she] too is subject to discretionary detention." *Id.*

However, pursuant to a new policy announced on July 8, 2025, entitled "Interim Guidance Regarding Detention Authority for Applicants for Admission," DHS/ICE now deem all persons who entered the United States without inspection "applicants for admission" under 8 U.S.C. § 1225(a), and therefore argue that they are subject to mandatory detention under § 1225(b)(2)(A). Respondents advance this position here, while Ms. Aguilar Maldonado argues that the statutory scheme makes clear that she falls under § 1226(a)'s discretionary detention provision, as the IJ also found.

The Court agrees with Ms. Aguilar Maldonado. A plain reading of § 1226(a) shows that she falls under the default process for the arrest and discretionary detention of aliens who are already present in the United States and may be eligible for removal. Under the plain text of the statute and the plain text of the Notice to Appear, she is an alien who is present in the United States without being admitted or paroled. (NTA at 1 (checking box

marked "You are an alien present in the United States who has not been admitted or paroled", but *not* checking box marked "You are an arriving alien").)

Except as provided in § 1226(c), the Attorney General may release an alien detained under 1226(a) on bond. 8 U.S.C. § 1226(a)(2)(A). The § 1226(c) carve-out for the mandatory detention of certain aliens applies to people who have committed enumerated criminal offenses and to certain categories of inadmissible people. 8 U.S.C. § 1226(c)(1)(A)–(E). When adding a new category of aliens subject to mandatory detention under § 1226(c) in the Laken Riley Act, Congress believed that the proper statutory scheme resided in § 1226. Under the Laken Riley Act, one of the new categories of inadmissibility is for aliens lacking valid documentation. 8 U.S.C. § 1226(c)(1)(E)(i). However, as the statute makes clear, that basis for inadmissibility only applies if the alien lacks valid documentation *and* is charged with or convicted of certain crimes. *Id.* § 1226(c)(1)(E)(i)–(ii). Here, although ICE amended its reasons for Ms. Aguilar Maldonado's arrest to include a charge that she lacked valid documentation, it is not alleged, nor have Respondents ever alleged, that Ms. Aguilar Maldonado has been charged with any crime whatsoever, much less one of the crimes enumerated in § 1226(c)(1)(E)(ii).

Thus, under the default provisions of § 1226, an ICE officer makes an official custody determination and if the alien is detained, they may generally request a bond hearing. That process occurred here—a bond hearing was held and the IJ released Ms. Aguilar Maldonado on bond. Section 1225(b) clearly supplements the § 1226 detention scheme. It applies to aliens seeking entry into the United States, i.e., applicants for admission, and it provides for mandatory detention.

26

Respondents argue that good public policy reasons support treating aliens appearing at the border the same as those already present in the United States. (Resp't Opp'n at 18, 20–21.) However, the law does not currently reflect such public policy considerations. Rather, such arguments may be made to Congress if Respondents would like to amend or repeal §§ 1225 or 1226, but such policy arguments are not reflected in the Laken Riley Act amendments to § 1226(c), passed only a few months ago.

Moreover, accepting Respondents' one-size-fits-all application of § 1225(b)(2) to all aliens, with no distinctions, would violate fundamental canons of statutory construction. Importantly, it would render § 1226 utterly superfluous. The recent Laken Riley Act amendments to § 1226(c), the legislative history of the IIRIRA, and longstanding practice supports this holding.

"[O]ne of the most basic interpretive canons" is that "a statute should be construed so that effect is given to all its provisions," and "no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up); *see also Haroun v. U.S. Dep't of Homeland Sec.*, 929 F.3d 1007, 1010 (8th Cir. 2019) ("When interpreting a statute, courts typically do not presume that Congress has used superfluous words in its enactments." (citation omitted)). If an interpretation of one statutory provision "would render another provision superfluous," courts presume that interpretation is wrong. *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010). This presumption "applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." *Id.* at 608. And it is "strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Rev. Corp.*, 568 U.S.

371, 386 (2013).    Relatedly, courts "presume differences in language … convey differences in meaning." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017). And courts "do not lightly" find that Congress adopted "two separate clauses in the same law to perform the same work." *United States v. Taylor*, 596 U.S. 845, 857 (2022).

Here, the presumption against superfluity is at its strongest because the Court is interpreting two parts of the same statutory scheme, and Congress even amended the statutory scheme this year when it passed the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025), adding Subsection (c)(1)(E) to § 1226.    The Government's novel interpretation of § 1225(b)(2) runs headlong into that new addition.    If § 1225(b)(2) already mandated detention of any alien who has not been admitted, regardless of how long they have been here, then adding § 1226(c)(1)(E) to the statutory scheme was pointless.    The Court will not find that Congress passed the Laken Riley Act to "perform the same work" that was already covered by § 1225(b)(2).

Moreover, this interpretation of the statutory scheme is entirely consistent with the Supreme Court's construction of §§ 1225 and 1226 in *Jennings*, 583 U.S. at 288–89.    There, the Supreme Court, explained that § 1225(b) covers "aliens seeking admission *into* the country," while § 1226 covers "aliens *already in* the country" who are subject to "removal proceedings."    *Id.* (emphasis added).

For all of these reasons, the Court finds that Petitioner's detention is governed by § 1226(a)'s discretionary framework, and she is not subject to § 1225(b)'s mandatory detention procedure.

### (4) Finding of Erroneous Deprivation

As to the second *Mathews* factor, the Court finds that the automatic stay provision, 8 C.F.R. § 1003.19(i)(2), creates a substantial risk of erroneous deprivation of Petitioner's interest in being free from arbitrary confinement. In *Günaydin*, 2025 WL 1459154, at *2, Judge Jeffrey Bryan considered a challenge from an immigration detainee who, like Ms. Aguilar Maldonado, had been ordered released on bond by an IJ, but whose release was stayed when the government invoked the automatic stay provision in 8 C.F.R. § 1003.19(i)(2). Applying the *Mathews* factors, Judge Bryan found the automatic stay provision created a substantial risk of erroneous deprivation of a detainee's interest in being free from arbitrary confinement. *Id.* at *8–9. As in *Günaydin*, Ms. Aguilar Maldonado faces a high risk of erroneous deprivation "because the only individuals adversely affected by this regulation are those detainees who have already prevailed in a judicial hearing." 2025 WL 1459154, at *8. The Court agrees with Judge Bryan's observations that

> [t]he regulation only confers on agency officials the right to invoke an automatic stay and, presumably, agency officials would not act to stay favorable decisions. Thus, the challenged regulation permits an agency official who is also a participant in the adversarial process to unilaterally override the immigration judge's decisions. Such a rule is anomalous in our legal system, and Respondents direct the Court to no other instance in any context in which a non-prevailing party is granted such authority.

*Id.*

In addition, the invocation of the automatic stay fails to account for any individualized facts, increasing the risk of erroneous deprivation. In *Günaydin*, Judge Bryan noted this risk:

> [T]he automatic stay regulation includes no requirement that the agency official invoking it consider any individualized or particularized facts, which increases the potential for erroneous deprivation of individuals' private rights. In the context of a bond order, the parties in immigration court contest whether the detainee poses a danger to the public and whether the detainee is a flight risk.

*Id.* At the hearing on Petitioner's redetermination of detention, IJ Ivany had the opportunity to consider Ms. Aguilar Maldonado's lack of any criminal history, finding that she posed no danger to the public or to national security because the IJ ordered Ms. Aguilar Maldonado released on bond. (Order Granting Bond at 3.) Moreover, IJ Ivany considered that Ms. Aguilar Maldonado entered this country as a UAC, and, therefore, "is not properly deemed an applicant for admission." (*Id.*) According to law, UACs are placed in removal proceedings under INA § 240, 8 U.S.C. § 1229a, regardless of whether they are older than 18 at the time of the proceedings. *See* 8 U.S.C. § 1232(a)(5)(D). Respondents have not cited, nor is the Court aware of, any sunset provisions stripping INA § 240 status for § 1229a removal proceedings upon a UAC reaching majority age. Thus, by invoking the automatic stay provision, an agency official "need not make any individualized or particularized justification for an action that results in the continued deprivation of liberty." *Günaydin*, 2025 WL 1459154, at *8.

Finally, the second *Mathews* factor requires the Court to consider the degree to which additional or substitute procedural safeguards could ameliorate the risks of erroneous deprivation. 424 U.S. at 335. In *Günaydin*, Judge Bryan found that "the regulation itself includes an obvious alternative," 2025 WL 1459154, at *9—the other procedure in 8 C.F.R. § 1003.19(i) allows DHS to request a discretionary stay from the BIA

"at any time" "(whether or not on an emergency basis)," 8 C.F.R. § 1003.19(i)(1). The Court agrees with Judge Bryan that this procedure would significantly reduce the risk of erroneous deprivation without imposing significant burdens on the Government.

In sum, § 1003.19(i)(2) presents a serious risk of erroneous deprivation of Ms. Aguilar Maldonado's private interests, and § 1003.19(i)(1) already provides a simple alternative that would safeguard those rights. The Court therefore finds that the second *Mathews* factor supports Ms. Aguilar Maldonado's claim of a Fifth Amendment violation.

### c. Respondents' Competing Interest and Burdens of Additional or Substitute Procedural Requirements

The third *Mathews* factor requires the Court to weigh the private interests at stake and the risk of erroneous deprivation of those interests against Respondents' interests in persisting with the automatic stay and the burdens of additional or substitute requirements. *Mathews*, 424 U.S. at 335.

As in *Günaydin*, 2025 WL 1459154, at *10, the Court finds that ensuring that persons subject to removal do not commit crimes or evade law enforcement is a significant governmental interest, but there is no showing here that public safety or ensuring Ms. Aguilar Maldonado's attendance at future proceedings requires a stay of the order releasing her on bond. Moreover, "existing statutory and regulatory safeguards adequately serve the governmental interest in promoting public safety." *Id*.

In sum, the Court finds that all three *Mathews* factors support Ms. Aguilar Maldonado's claim that § 1003.19(i)(2) violates her procedural due process rights under the Fifth Amendment. Respondents rely on *Barajas Farias v. Garland*, No. 24-cv-4366

(MJD/LIB), 2024 WL 6070211 & 6074470 (D. Minn. Dec. 4 & 6, 2024), in support of their argument that the invocation of the automatic stay provision does not alter the constitutionality of Ms. Aguilar Maldonado's detention.  (Resp't Opp'n at 22–24.)  *Farias* is inapposite, however, because unlike Petitioner, Mr. Barajas Farias was detained for a conviction of a security-related offense and was subject to mandatory detention under 8 C.F.R. § 1003.19(h)(2).  Moreover, *Barajas Farias* did not address the automatic stay regulation, but rather certain exemptions from bond considerations under § 1226.

The Court likewise finds *Banyee v. Garland* inapposite, as the Eighth Circuit addressed a constitutional challenge to mandatory detention under § 1226(c) for the length of the detainee's removal proceedings.  115 F.4th 928 (8th Cir. 2024).  Again, unlike Petitioner, Mr. Banyee's lengthy criminal history placed him in custody under § 1226(c).  *Id.* at 930.  *Banyee* also does not involve the automatic stay provision at issue here.

Accordingly, the Court finds that consideration of Petitioner's likelihood of success on the merits—the first *Dataphase* factor—weighs in her favor.

### 2.  Threat of Irreparable Harm

The second *Dataphase* factor requires the Court to consider the threat of irreparable harm absent injunctive relief.  "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

Ms. Aguilar Maldonado presents compelling facts in support of a finding of irreparable harm.  She has two small children, both U.S. citizens, from whom she has not

been previously separated, and she is nursing one of them.[5] (Aguilar Maldonado Aff. ¶¶ 3–4, 11.)   In support of her Motion for a Preliminary Injunction, she submits an official policy, ICE Directive 11032.4, "Identification and Monitoring of Pregnant, Postpartum, or Nursing Individuals," which provides, "Generally, ICE should not detain, arrest, or take into custody for an administrative violation of the immigration laws individuals known to be pregnant, postpartum, or nursing unless release is prohibited by law or exceptional circumstances exist." (Pet'r's Ex. H (ICE Directive 11032.4) at 1 [Doc. No. 1-8].)

Respondents contend that ICE considers this policy revoked pursuant to Executive Order 14159. (Resp't Opp'n at 29.)   However, it provides no further support for this position.   Executive Order 14159, entitled "Protecting the American People Against Invasion," is a broad policy statement of the current administration regarding immigration policy.    National   Archives,   90   Fed.   Reg.   8443,   Executive   Order   14159, https://www.federalregister.gov/documents/2025/01/29/2025-02006/protecting-the-american-people-against-invasion (Jan. 20, 2025).   It underscores the administration's concerns about the threats posed by certain immigrants, including threats to national security and public safety.  *See, e.g., id.* §§ 1, 2, 4.  The Executive Order contains no

---

[5] In her Affidavit, Ms. Aguilar Maldonado also includes facts that Respondents construe as related to her conditions of confinement (*see, e.g.*, Aguilar Maldonado Aff. ¶¶ 6–9), and Respondents therefore argue such facts are not properly before the Court in this proceeding. (Resp't Opp'n at 29 n.9.)  While the Court agrees with Respondents as a general matter, counsel for Petitioner clarified at the hearing on this Motion that the Affidavit included such facts not as challenges to her conditions of confinement, but in support of her claim of irreparable harm.  In any event, the Court need not consider these jail-conditions-related facts, as the other facts overwhelmingly demonstrate irreparable harm.

references to nursing mothers, let alone nursing mothers who lack any criminal history whatsoever.

Other than noting the Executive Order, Respondents give short shrift to irreparable harm.  They do not refute or respond to Ms. Aguilar Maldonado's claims of irreparable harm.

The Court finds that the harm of separating a nursing mother and child is self-evident.  Accordingly, this factor weighs in Ms. Aguilar Maldonado's favor.

### 3.  Balance of Harms & Public Interest

While the balance of harms and the public interest are typically separate factors, they "merge when the Government is the party opposing the preliminary injunction." *Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022).  Under these facts, this *Dataphase* factor largely replicates the second and third *Mathews* factors, which weigh the risk of erroneous deprivation of Petitioner's private interests against Respondents' interests in persisting with the automatic stay and avoiding burdens from additional or substitute requirements. 424 U.S. at 335.

Again, while Respondents and the public have a significant interest in ensuring that persons subject to immigration proceedings do not commit crimes or evade law enforcement, there is no showing that the facts here implicate these concerns.  ICE will suffer no articulable harm if it simply permits the immigration process to continue with Ms. Aguilar Maldonado released on bond, consistent with IJ Ivany's Order.  It is ICE that

seeks to disrupt the status quo by invoking the automatic stay and keeping Ms. Aguilar Maldonado in detention. Asylum proceedings are underway and ICE has appealed the issue of detention to the BIA. There is no harm to Respondents, nor is there any way in which this longstanding statutory authority and its application in this case interferes with ICE's proper enforcement of U.S. immigration laws. In contrast, Ms. Aguilar Maldonado has a significant interest in freedom from detention on bond, based on her separation from her children, one of whom is a nursing child.

In conclusion, the Court finds that the *Dataphase* factors weigh in favor of granting injunctive relief.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that

1. Petitioner's Motion for a Temporary Restraining Order, which the Court construes as a Motion for a Preliminary Injunction [Doc. No. 2], is **GRANTED**.

   a. Samuel J. Olson, Field Office Director of Enforcement and Removal Operations, St. Paul Field Office, Immigration and Customs Enforcement, is **ENJOINED** from enforcing the automatic stay provision of 8 C.F.R. § 1003.19(i)(2) during the pendency of this Court's consideration of the Petition for a Writ of Habeas Corpus.

   b. Petitioner is ordered released and is required to post bond as per the ruling of IJ Kalin Ivany.

Dated: August 15, 2025                              s/Susan Richard Nelson
                                                    SUSAN RICHARD NELSON
                                                    United States District Judge